**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

_____

RICHARD KIRSCH, DDS,

    Plaintiff,

v.                                                        Case No. 20-11930

ASPEN AMERICAN INSURANCE COMPANY,

    Defendant.
_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO DISMISS

### I. INTRODUCTION

Plaintiff Richard Kirsch, DDS, the owner of a Dearborn Heights dental practice, filed a complaint against Defendant Aspen American Insurance on behalf of himself and all others similarly situated. Plaintiff alleges that Defendant breached the provisions of an insurance contract when Defendant refused to pay Plaintiff's claim for loss of income and extra expenses. The claim stems from a Michigan executive order that suspended all non-emergency dental procedures for approximately two months in an attempt to slow the spread of Coronavirus Disease ("COVID-19"). Plaintiff seeks damages for breach of contract as well as a declaratory judgment that the insurance contract covers the loss of income and extra expense incurred by Plaintiff and all others similarly situated. Defendant now moves to dismiss the complaint for failure to state a claim on which relief can be granted. The motion has been fully briefed. Upon review of the parties' filings, the court concludes that a hearing is not necessary. *See* E.D. Mich. LR

7.1(f)(2). For the reasons stated below, the motion to dismiss will be granted, and the complaint will be dismissed with prejudice.

## I. BACKGROUND

The following facts are drawn from the complaint and the documents attached thereto. Plaintiff Richard Kirsch, DDS, owns a dental practice in Dearborn Heights Michigan. (ECF No. 1-2, PageID.22.) Plaintiff purchased a "Building, Blanket Dental Practice Personal Property and Income Coverage" policy ("the policy") from Defendant Aspen American Insurance Company that was in effect during the spring of 2020. (*Id.* at 22, 24.)

Like most businesses, Plaintiff's dental practice was detrimentally affected when Michigan's Governor, Gretchen Whitmer, issued Executive Order 2020-17 ("the executive order") on March 23, 2020 aimed at slowing the spread of COVID-19. In what amounted to a stay of "excavation" for cavities throughout the state, the executive order required that dental facilities suspend all non-essential procedures. (*Id.* at 23.) As a result of this order, Plaintiff alleges that "use of the Dearborn Heights building for dental activities was suspended for more than two months" until a subsequent May 26, 2020 order was issued that allowed the resumption of non-emergency dental procedures. (*Id.* at 24.) The complaint does not allege any of the COVID-19 virus was present in the dental practice at the time of, or during, the mandated shutdown.

Plaintiff sought coverage for a loss of practice income under various provisions of the insurance policy issued by Defendant. (*Id.*) But Defendant denied coverage, and Plaintiff filed suit for breach of contract and declaratory relief in Wayne County Circuit

Court.[1] (*See* ECF No. 1-2.) As a Texas corporation with a principal place of business in Connecticut, Defendant removed the action to federal court based on diversity jurisdiction under 28 U.S.C. § 1332 and Defendant alleges that the amount in controversy exceeds $75,000. (*See* ECF No. 1.)

Plaintiff and Defendant agree that their dispute is governed by the terms of a valid property insurance policy purchased by Plaintiff. The policy is attached to the initial complaint. (*See* ECF No. 1-2, PageID.33-161.) Based on the language of the policy limiting coverage for lost business income resulting from "direct physical damage" to property, Defendant moves to dismiss the lawsuit. (*See* ECF No. 12.)

### III. STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for dismissal of a complaint for failure to state a claim upon which relief may be granted. Under the Rule, the court construes the complaint in the light most favorable to plaintiff and accepts all well-pleaded factual allegations as true. *Barber v. Miller*, 809 F.3d 840, 843 (6th Cir. 2015).

Federal Rule of Civil Procedure 8 requires a plaintiff to present in the complaint "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint must provide sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that defendant acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of

---

[1] Plaintiff's complaint also seeks to establish a class of other similarly situated dental practices throughout the state that purchased insurance from Defendant. (ECF No. 1-2, PageID.26) The issue of class certification is irrelevant to the present motion.

3

action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). "To state a valid claim, a complaint must contain either direct or inferential allegations respecting all the material elements to sustain recovery under some viable legal theory." *Boland v. Holder*, 682 F.3d 531, 534 (6th Cir. 2012) (emphasis removed) (citing *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007)). Determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

In reviewing a motion to dismiss, the court may consider "any exhibits attached [to the complaint], public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. NCAA*, 528 F.3d 426, 430 (6th Cir. 2008).

## IV. DISCUSSION

Both sides agree that the present dispute is essentially limited to the proper interpretation of the insurance policy at issue under Michigan law. (ECF No.12, PageID.268; ECF No.16, PageID.364.) In Michigan "an insurance contract must be enforced in accordance with its terms." *Henderson v. State Farm Fire & Cas. Co.*, 460 Mich. 348, 596 N.W.2d 190, 193 (1999). "Terms in an insurance policy must be given

their plain meaning and the court cannot create an ambiguity where none exists." *Heniser v. Frankenmuth Mut. Ins. Co.*, 449 Mich. 155, 534 N.W.2d 502, 505 (1995) (internal quotation marks omitted). The plain and ordinary meaning of undefined contract terms "may be determined by consulting dictionaries." *McGrath v. Allstate Ins. Co.*, 290 Mich. App. 434, 439, 802 N.W.2d 619, 622 (2010) (citations omitted).

Michigan defines "an ambiguity in an insurance policy to include contract provisions capable of conflicting interpretations." *Auto Club Ins. Ass'n v. DeLaGarza*, 433 Mich. 208, 444 N.W.2d 803, 805 (1989). Ambiguous terms "are construed against its drafter and in favor of coverage." *Id.* at 806.

"Michigan courts engage in a two-step analysis when determining coverage under an insurance policy: (1) whether the general insuring agreements cover the loss and, if so, (2) whether an exclusion negates coverage." *K.V.G. Properties, Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 821 (6th Cir. 2018) (citing *Auto-Owners Ins. Co. v. Harrington*, 455 Mich. 377, 565 N.W.2d 839, 841 (1997)). A policy provision, such as an exclusion, is valid "as long as it is clear, unambiguous and not in contravention of public policy." *Harrington*, 565 N.W.2d at 841 (internal quotation marks omitted).

### A. The Property Insurance Policy

In its "Coverage Agreements" (Section I), the policy explains that it covers "all *direct physical damage to covered property* at the premises described on the Declarations caused by or resulting from any covered cause of loss." (ECF No. 1-2, PageID.140 (emphasis added).) The policy also contains "limits on insurance" (Section II) and exclusions (Section III). In Section I, the policy explains it will cover losses in six categories, including: the building, dental practice personal property, practice income,

5

extra expenses, extended practice income, and lost rent. (*Id.* at 140-43.) The practice income provision explains the policy:

> will pay for the actual loss of practice income you sustain, or the Valued Daily Limit, as described under Limits of Insurance provision III.E.6., due to the necessary suspension of your practice during the period of restoration. The suspension must be caused by *direct physical damage to the building or blanket dental practice personal property* at the described premises caused by or resulting from a covered cause of loss or power failure as described under.

(*Id.* at 142. (emphasis added).) A "civil authority" clause expands the practice income coverage to include:

> [an] actual loss of practice income and rents you sustain caused by action of civil authority that prohibits access to the described premises *due to the direct physical damage to property*, other than at the described premises, caused by or resulting from any covered cause of loss. . . up to 30 consecutive days. . .

(*Id.* at 146 (emphasis added)).

Further, the policy's "extra expense" provision adds coverage for additional "expenses necessarily incurred by you during the period of restoration to continue normal services and operations which are interrupted due to damage." (*Id.* at 143.) But the policy states:

> [it] will only pay for extra expenses that you incur within 12 consecutive months after the date of *direct physical damage* or power failure as described under Paragraph I.B.8.

(*Id.*) (emphasis added.)

The final part of the policy (Section IV) offers definitions for different terms including "damages" and "covered cause of loss."

> "Damage" means partial or total loss of or damage to your covered property.
> . . .
> "Covered Causes of Loss" means ALL RISK OF DIRECT PHYSICAL LOSS except as excluded or limited in Section II, of this Coverage Part. ALL RISK OF DIRECT PHYSICAL LOSS shall also include the following: [Collapse and Water Damage]

(*Id.* at 158.) The policy contains no specific exclusions or definitions dealing specifically with viruses.

6

### 1. Practice Income Provision

Defendant moves to dismiss the present action, arguing Plaintiff has failed to establish that the executive order resulted in "direct physical damage to property" as the policy requires for a claim. (ECF No. 12, PageID.260.) Defendant argues that because the executive order's restriction on dental procedures did not cause "tangible or discernible property loss or damage," the policy's lost practice income provision was not implicated. (*Id.* at 264.)

Plaintiff responds by arguing that "tangible physical damage is not a prerequisite to coverage" under the lost income provision. (ECF No. 16, PageID.365.) In support, Plaintiff focuses on the policy's broad definition of "damage" which is defined to include "partial or total loss of or damage to" covered property. (*Id.* at 368.) Plaintiff further argues that if the phrase "loss of" in the definition is read to require "tangible, physical damage" then the word *loss* would be "strip[ped] of its plain and ordinary meaning" and be rendered "superfluous" to the ordinary definition of "damage." (*Id.*)

The court concludes that Defendant's interpretation is largely correct. As a leading treatise on property insurance—cited by the Sixth Circuit—explains, usually a property insurance "policy specifically ties the insurer's liability to the covered peril having some specific effect on the property." *"Physical" loss or damage*, 10A Couch on Ins. § 148:46.  And, "[i]n modern policies. . . this trigger is frequently 'physical loss or damage' but may be any of several variants focusing on 'injury,' 'damage,' and the like." *Id.* A policy requirement that a loss be *physical* "is widely held to exclude alleged losses that are intangible or incorporeal and, thereby, to preclude any claim against the

property insurer when the insured merely suffers a detrimental economic impact unaccompanied by a distinct, demonstrable, physical alteration of the property." *Id.*

While there is no published Michigan court decision interpreting the language of a standard "direct physical loss or damage" policy provision, the Sixth Circuit, found that Michigan courts would likely follow the majority rule and require "tangible damage" for coverage under such a policy provision. *See Universal Image Prods., Inc. v. Fed. Ins. Co.*, 475 F. App'x 569, 573 (6th Cir. 2012) (citing *Acorn Inv. Co. v. Michigan Basic Prop. Ins. Ass'n*, No. 284234, 2009 WL 2952677, at *1 (Mich. Ct. App. Sept. 15, 2009)) (noting that the Michigan Court of Appeals had previously relied on a Texas opinion to define the word "direct" and the Texas opinion relied on also found a tangibility requirement in the "direct physical loss" provision). In *Universal Image Prods.*, the court found that cleaning expenses, moving costs, and lost income due to the discovery of mold in the ventilation system of Plaintiff's leased office space was not covered by a property insurance policy that limited coverage to "direct physical loss or damage" *Id.* at 571-73. Since "[a]ll remediation efforts were paid for by [plaintiff]'s landlord, and not a single piece of [plaintiff]'s physical property was lost or damaged as a result of mold or bacterial contamination," the Sixth Circuit found the claim losses were "not tangible, physical losses, but economic losses." *Id.* at 573.

In a recent decision in this court involving a chiropractor's loss of income due to the same Michigan COVID-19 executive order, the court found that the order did not implicate an insurance policy providing coverage against "accidental direct physical loss to Covered Property." *Turek Enterprises, Inc. v. State Farm Mut. Auto. Ins. Co.*, No. 20-11655, 2020 WL 5258484, at *5, 8 (E.D. Mich. Sept. 3, 2020) (Ludington, J.) (holding

8

that "'[a]ccidental direct physical loss to Covered Property'" is an unambiguous term that plainly requires Plaintiff to demonstrate some tangible damage to Covered Property. "Because Plaintiff has failed to state such damage, the complaint does not allege a Covered Cause of Loss.").

Plaintiff attempts to distinguish both *Universal Image Prods.* and *Turek* but its arguments are unpersuasive. First, Plaintiff points out that the Sixth Circuit's reading of the "direct physical loss or damage" provision in *Universal Image Prods* was not essential to the court's ultimate holding. (ECF 16, PageID.367.) It is true that the *Universal Image Prods.* court would have reached the same outcome, "even if Michigan were to adopt a more expansive definition of the phrase 'direct physical loss or damage'" because the mold in the case never made the leased space "'uninhabitable' or substantially 'unusable.'" *Universal Image Prods., Inc.*, 475 F. App'x at 574. But the opinion's reasoning explaining why Michigan would adopt the majority approach to policy interpretation—requiring tangible damage—is still persuasive. As the *Turek* court explains:

> Michigan courts determine a word's ordinary meaning by consulting a dictionary. Merriam-Webster Dictionary defines "physical" as "having material existence; perceptible especially through the senses and subject to the laws of nature." Physical, Merriam-Webster, https://www.merriam-webster.com/dictionary/physical (last visited Aug. 31, 2020). Here, "physical" is an adjective modifying "loss," which is defined as, inter alia, "destruction, ruin," "the act of losing possession," and "a person or thing or an amount that is lost." Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss (last visited Aug. 31, 2020).

*Turek Enterprises*, 2020 WL 5258484, at *6 (citation omitted). The court sees no reason to part company with this interpretation of the phrase "direct physical loss."[2]

---

[2] It is true that some courts have adopted a minority position, holding that "physical loss" occurs when real property becomes "uninhabitable" or substantially

9

Perhaps anticipating such an outcome, Plaintiff also argues that the policy language at issue in the present case is distinguishable from the policies in *Universal Image Prods.* and *Turek*. (ECF No. 16, PageID.367.) Plaintiff points out that the court in *Turek* found the inclusion of the preposition "to" in the phrase "direct physical loss to Covered Property," as opposed to the preposition "of," strengthened the case for its interpretation requiring tangible damage for a valid claim. (*Id.* (citing *Turek Enterprises*, 2020 WL 5258484, at *6).) So, Plaintiff reasons that "[t]he language in Dr. Kirsch's policy covering 'partial or total loss *of* or damage to' the covered property is the exact language the *Turek* court said would establish a plausible claim." (*Id.*)

Such a reading of the policy at issue here is misleading. In making his argument Plaintiff quotes the policy's definition which defines "damage" as "partial or total loss *of* or damage to your covered property." (ECF No. 1-2, PageID.158 (emphasis added)). However, both the practice income and civil authority provisions of the policy expressly limit coverage to "direct physical damage *to* the [covered property]." (*Id.* at 142, 46. (emphasis added).) Reading the definition of *damage* and the applicable policy

---

"unusable." *See e.g.*, *Port Auth. of New York & New Jersey v. Affiliated FM Ins. Co.*, 311 F.3d 226, 236 (3d Cir.2002) ("When the presence of large quantities of asbestos in the air of a building is such as to make the structure uninhabitable and unusable, then there has been a distinct [physical] loss to its owner."); *Prudential Prop. & Cas. Co. v. Lillard–Roberts*, CV–01–1362–ST, 2002 WL 31495830, at *9 (D.Or. June 18, 2002) (holding a "direct physical loss" is possible when property is "rendered uninhabitable by mold"); *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385, at *4 (W.D. Mo. Aug. 12, 2020) (denying a motion to dismiss because "COVID-19 allegedly attached to and deprived Plaintiffs of their property, making it 'unsafe and unusable'"). The court sees no indication that Michigan court courts would adopt this minority view, in fact, the first Michigan court to consider this issue (albeit in an unpublished Circuit Court ruling) also found that tangible damage was required under the plain meaning of such an insurance provision and it held that a COVID-19 damage claim would fail. *See Management Co. LLC v. Michigan Ins. Co.*, No. 20-258-CB, 2020 WL 4561979, at *1 (Mich. Cir. Ct. July 21, 2020).

provisions together it becomes apparent that the coverage provided by the policy is at least as narrow as the "direct physical loss to Covered Property" limitation in *Turek*. *See* 2020 WL 5258484, at *6. While the policy adopts a rather broad definition of the word "damage" that definition is further cabined when the word "damage" is used with the adverbs "direct" and "physical" as well as the preposition "to." Like *Turek*, these additional words act to define the subset of damage covered by the policy. The ordinary meaning of these words makes clear that a mere loss of use is insufficient to implicate coverage—just as the same adjectives and preposition made clear in *Turek* that the policy only covered a subset of possible losses.[3] *See id.* Therefore, the court finds that coverage under the policy's practice income provision is limited to instances where tangible damage to physical property has occurred.

Because Plaintiff has not "alleged that COVID-19 particles attached to and damaged their property" Plaintiff has not even attempted to establish that COVID-19 caused tangible, physical damage to the property itself. *See Turek Enterprises*, 2020 WL 5258484, at *7 (E.D. Mich. Sept. 3, 2020) (quoting *Studio 417, Inc. v. Cincinnati Ins. Co.*, No. 20-CV-03127-SRB, 2020 WL 4692385, at *6 (W.D. Mo. Aug. 12, 2020)). Like

---

[3] The court also notes that the definition of "damage" contained in the policy is not quite as broad as Plaintiff contends. The definition does NOT cover *all* losses of or damage to your covered property but instead includes only "*partial* or *total* loss of or damage to your covered property." (ECF No. 1-2, PageID.158 (emphasis added).) Black's Law Dictionary makes clear that both "partial loss" and "total loss" are phrases that have a distinct meaning in a legal context apart from the broader definition of "loss". *See* LOSS, Black's Law Dictionary (11th ed. 2019) (separately defining partial loss as "[a] loss of part of the insured property; damage not amounting to a total loss," and, a total loss as "[t]he complete destruction of insured property so that nothing of value remains and the subject matter no longer exists in its original form.") The most straightforward reading of the provision therefore is that the phrases *partial* and *total* loss are included in the definition to merely make clear that the physical property is covered both when it is completely destroyed and when it is only partially damaged.

11

other viruses, COVID-19 injures people but does not seem to cause any lasting damage to physical property. Because Plaintiff's claim, as pled, alleges only a temporary loss of use of Plaintiff's property, the tangibility requirement implicit in the policy forecloses a claim under the practice income provision.

### 2. Civil Authority Provision

Likewise, the civil authority provision which provides coverage when a civil authority "prohibits access to the described premises due to *the direct physical damage to property*, other than at the described premises," (ECF No. 1-2, PageID.146 (emphasis added)), is not implicated by the executive order. The factual allegations in the complaint allege no tangible damage to other's property that would support a claim under the provision's language. (*See* ECF No. 1-2, PageID.23-5.)

Even if Plaintiff were able to point to direct physical damage to other property due to COVID-19, he has also failed to state a nexus between prior property damage and the executive order. Defendant cites a number of cases indicating that preemptive government shutdown orders to protect property do not establish a causal link between the damage to property and order barring access.[4] *See e.g. United Air Lines, Inc. v. Ins. Co. of State of PA*, 439 F.3d 128, 134 (2d Cir. 2006) (declining to provide United coverage under a civil authority insurance provision for lost earnings stemming from the shutdown of Ronald Reagan Washington National Airport after Sept. 11th, 2001 because "the government's subsequent decision to halt operations at the Airport

---

[4] It is also not clear that that the executive order actually "prohibit[ed] access" access to Plaintiff's dental office. Afterall, the order stated that Plaintiff was free to continue conducting emergency dental procedures at the facility. (ECF No. 1-2, PageID.23.)

indefinitely was based on fears of future attacks" not due to existing damage to the Pentagon.); *Paradies Shops, Inc. v. Hartford Fire Ins. Co.,* No. 1:03-CV-3154-JEC, 2004 WL 5704715, at *7 (N.D. Ga. Dec. 15, 2004) (holding that civil authority insurance coverage was unavailable for airport shops after the FAA shutdown flights on Sept. 11th, 2001 because the order was "designed to prevent, protect against, or avoid future damage [and] is not a 'direct result; of already existing property loss or damage."); *Syufy Enterprises v. Home Ins. Co. of Indiana*, No. 94-0756 FMS, 1995 WL 129229, at *2 (N.D. Cal. Mar. 21, 1995) (denying "civil authority" insurance coverage for a movie theater closed by a curfew designed to "prevent 'potential' looting" because the "requisite causal link between damage to adjacent property and denial of access to a Syufy theater is absent"). In the present action, Plaintiff does not directly respond to, or attempt to distinguish, these precedents. (*See* ECF 16.) Plaintiff has failed to establish that the COVID-19 executive order was a direct result of damage to existing property as opposed to an attempt to curtail the virus's spread and future damage.

### 3. Extra Expense Provision

Plaintiff seeks coverage under the policy's extra expense provision. (ECF No. 1-2, PageID.25.) Defendant responds by arguing that the extra expense provision "is also limited to losses caused by direct physical damage" because "Plaintiff has alleged no direct physical damage and no property in need of restoration" his losses fall outside the policy's coverage. In his response to the motion to dismiss, Plaintiff concedes that coverage under this clause likely hinges on whether the policy requires "tangible damage." (ECF No.16, PageID.375.) Since the court has already found that the identical "direct physical damage" language in the practice income and civil authority provisions

13

require a Plaintiff to allege tangible property damage, the court must agree with Defendant's conclusion. (*See* ECF No. 12, PageID.279.) As explained above, Defendant has not alleged that COVID-19 was present in his dental office during the period in question. Therefore, based on the provision's ordinary meaning, extra expenses incurred due to the executive order are not covered by the policy.

### B. Ordinance of Law Policy Endorsement

Plaintiff purchased additional "Ordinance or Law Coverage Extension" coverage. The endorsement provides increased coverage for "Business Income and Extra Expense" during a period of restoration. (ECF No. 1-2, PageID.63.) However, the coverage is only available when enforcement of an ordinance: "1) Regulates the construction, repair or replacement of any property; 2) Requires the tearing down or replacement of any parts of property not damaged by a covered cause of loss; and 3) Is in force at the time of loss." (*Id.* at 63-64.) While Plaintiff's complaint cites this provision as a source of extra coverage, (*Id.* at 25), Defendant argues that the complaint "fails to allege any facts that satisfy condition[s]" (1) and (2). (ECF No. 12, PageID.282.) Since the conjunction "and" is used, the court concludes that the Ordinance of Law endorsement requires all three of the above conditions be satisfied for the enhanced coverage to apply. Because the complaint does not allege specific damage to the facility requiring repair, this policy endorsement is not implicated. Plaintiff appears to concede as much as its response to the motion to dismiss does not address Defendant's argument against coverage under the ordinance or law enhancement.

## V. CONCLUSION

For the reasons explained above, the court finds that the property insurance policy purchased by Plaintiff Kirsch does not apply to lost practice income and related expenses caused by a temporary Michigan executive order prohibiting non-essential dental procedures. Accordingly,

IT IS ORDERED that Defendant's motion to dismiss (ECF No. 12) is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's complaint, (ECF No. 1-2), is DISMISSED WITH PREJUDICE.

            s/Robert H. Cleland    /
            ROBERT H. CLELAND
            UNITED STATES DISTRICT JUDGE

Dated:  December 14, 2020

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, December 14, 2020, by electronic and/or ordinary mail.

            s/Lisa Wagner     /
            Case Manager and Deputy Clerk
            (810) 292-6522

S:\Cleland\Cleland\AAB\Opinions and Orders\Civil\20-11930.KIRSCH.MTD.AAB.RHC.docx